## LANEY v. UNITED STATES.

(Court of Appeals of District of Columbia. Submitted November 8, 1923. De-·
cided December 3, 1923.    Rehearing Denied December 21, 1923.)

No. 4000.

**1. Homicide ⊖⟹300(9)—Evidence held not to warrant charge on self-defense.**

Evidence that during a race war defendant, a negro, ran into an area-
way, where he was in comparative safety, and could have gone home by
a back way, but adjusted his revolver, and then went back on the side-
walk near a mob attacking a house on the opposite side of the street, *held*
not to warrant charging on the law of self-defense.

**2. Homicide ⊖⟹276—Issue of self-defense not left to jury, where in court's judg-
ment facts did not admit of that defense.**

If the facts in the judgment of the court are not such as to admit of
self-defense, that issue should not be left to the mere speculation of the
jury.

**3. Homicide ⊖⟹118(1)—Defendant must do everything to avoid danger to be·
entitled to right of self-defense.**

Before a person can avail himself of the plea of self-defense against a
charge of homicide, he must do everything in his power consistent with
his safety to avoid the danger, and avoid the necessity of taking life.

**4. Homicide ⊖⟹118(1)—Defendant not required to retreat, unless affray can·
be avoided.**

A defendant claiming the right of self-defense is not required to re-
treat, when he is assailed in a place where he has a right to be, unless by
so doing an affray can be clearly avoided.

**5. Homicide ⊖⟹109, 123, 124—One entitled to defend domicile to extent of taking·
life, if necessary.**

One may defend his domicile or his property to the extent of taking
life, when necessary in the defense of his property, or to protect himself
or those in his charge from death or bodily injury.

**6. Homicide ⊖⟹114—Self-defense not available to party participating in contest.**

Where a person voluntarily participated in a contest or mutual combat
for purposes other than protection, he cannot justify or excuse the killing
of his adversary on the ground of self-defense.

**7. Homicide ⊖⟹261—Evidence of post mortem examination admissible, though no
notice given to defendant.**

Testimony relative to a post mortem examination of decedent's body
is admissible, though no notice was given to defendant of the govern-
ment's intention to make the investigation, and Code, § 686, was not com-
plied with.

**8. Criminal law ⊖⟹475—Expert testimony as to pistol from which bullet came
competent.**

Expert testimony that the bullet extracted from decedent's head was
shot from the pistol found in defendant's possession was competent, es-
pecially where defendant admitted firing a number of shots at a crowd.

**9. Searches and seizures ⊖⟹7—Warrant not necessary for entry to arrest for
murder.**

A search warrant is not necessary to legalize an officer's entry into
defendant's room to arrest him on a charge of murder in the first degree.

**10. Criminal law ⊖⟹394—Evidence obtained at time of arrest not within consti-
tutional inhibition.**

Evidence of crime obtained by officers at the time of arrest, either
found on accused or in his possession, is not within the constitutional
provision forbidding seizure without a search warrant.

⊖⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

11. **Criminal law ⬦665(4), 1153(5)—Admission of evidence of witnesses violating order by remaining in courtroom within court's discretion, and not usually reviewable.**

The admission of testimony of witnesses remaining in a courtroom in violation of an order is a matter within the sound discretion of the trial court, and usually will not be reviewed.

12. **Criminal law ⬦1137(2)—Precluded from complaining of situation created by counsel.**

Counsel cannot complain of being prejudiced by a situation which he created.

Appeal from the Supreme Court of the District of Columbia.

William Laney was convicted of manslaughter, and he appeals. Affirmed.

James A. Cobb, William L. Houston, and Royal A. Hughes, all of Washington, D. C., for appellant.

Peyton Gordon, of Washington, D. C., for the United States.

Before SMYTH, Chief Justice, VAN ORSDEL, Associate Justice, and MARTIN, Presiding Judge of the Court of Customs Appeals.

VAN ORSDEL, Associate Justice. This appeal is from a verdict and judgment of the Supreme Court of the District of Columbia, adjudging appellant, defendant below, guilty of the crime of manslaughter. The indictment charged the defendant with the crime of murder in the first degree, growing out of the killing of one Kenneth Crall, during a race riot in Washington on July 21, 1919.

[1] The defense interposed was self-defense, and a large number of assignments of error are based upon the refusal of the court to grant certain prayers offered by the defendant relating to the law of self-defense. The court instructed the jury on 'this subject, but we think it will be unnecessary for us to consider the assignments of error in relation to the prayers offered, since in our opinion, viewing the evidence in the most favorable aspect, self-defense does not enter into the case.

Defendant testified as follows:

"On the night of the 21st of July, 1919, I went to the theater with Mattie Burke, and came back and went up on Seventh street at the request of Teresa Dobbins, to get Florence and Garfield Wood. On my return to 617 Massachusetts avenue, as I got to the corner where the Home Savings Bank is located, a large crowd that was there started to yelling 'Catch the nigger!' and 'Kill the nigger!' and started to chase me. I ran ahead of them down Massachusetts avenue. When I got near to 617 Massachusetts avenue, I pulled out my gun and the crowd stopped chasing me. I went into the back yard, and while trying to fix the safety on my gun it went off. I then put the gun in my pocket and went to the front again, intending to go back to my place of employment. The mob was attacking a house across the street, and were coming both ways on Massachusetts avenue, from the direction of Sixth and from the direction of Seventh street. * * * While I was in the areaway between 617 and 619, the mob came across from the south side of the street, firing and hollering 'Let's kill the nigger!' The mob was firing at me, and I shot in the direction towards Seventh street. I fired to protect my life. I fired three shots. My pistol had eight bullets in it at first. There were four bullets in it when it was taken by the officials; three bullets having been fired in the front yard and one in the back yard."

⬦For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The witness Mattie Burke testified, in relation to the movements of the defendant, as follows:

"Later he came running back, with a mob chasing him, throwing sticks and stones at him, hollering 'Catch the nigger!' I think Mr. Laney had his gun in his hand while he was running, but I did not see him do anything with it. He ran into the areaway between 615 and 617. The crowd, consisting of 100 or·more men, then started after a house on the opposite side of the street. At that time William Laney went into the back yard and·tried his gun. I was with him in the back yard at the time. Then we came out to the front again. After attacking the house on the opposite side of the street, the mob gathered in the car track as though they were coming toward 617, and then Laney fired his gun. After Laney had escaped through the back way, the crowd began·to break into the house, and then I escaped myself over the back fence, and I did not see any more."

[2] It is clearly apparent from the above testimony that, when defendant escaped from the mob into the back yard of the Ferguson place, he was in a place of comparative safety, from which, if he desired to go home, he could have gone by the back way, as he subsequently did. The mob had turned its attention to a house on the opposite side of the street. According to Laney's testimony, there was shooting going on in the street. His appearance on the street at that juncture could mean nothing but trouble for him. Hence, when he adjusted his gun and stepped out into the areaway, he had every reason to believe that his presence there would provoke trouble. We think his conduct in adjusting his revolver and going into the areaway was such as' to deprive him of any right to invoke the plea of self-defense. Of course, the extent to which a person assailed may go, under a given state of facts involving self-defense, is always a question of fact for the jury; but whether or not self-defense can be invoked under the evidence adduced is a question of law for the court to determine. If the facts, in the judgment of the court, are not such as to admit of this defense, the issue should not be·left to the mere speculation of the jury.

[3] It is a well-settled rule that, before a person can avail himself of the plea of self-defense against the charge of homicide, he must do everything in his power, consistent with his safety, to avoid the danger and avoid the necessity of taking life. If one has reason to believe that he will be attacked, in a manner which threatens him with bodily injury, he must avoid the attack if it is possible to do so, and the right of self-defense does not arise until he has done everything in his power to prevent its necessity. In other words, no necessity for killing an assailant can exist, so long as there is a safe way open to escape the conflict. Allen v. United States, 164 U. S. 492, 17 Sup. Ct. 154, 41 L. Ed. 528; Lee v. State, 92 Ala. 15, 9 South. 407, 25 Am. St. Rep. 17; People v. Kennedy, 159 N. Y. 346, 54 N. E. 51, 70 Am. St. Rep. 557.

We are aware of the wide diversity of opinion as to the duty to retreat, but this difference arises from the circumstances of the particular case under consideration, rather than from any difference of conception as to the rule itself. Time, place, and conditions may create a situation which would clearly justify a modification of the rule. For example, the common-law rule, which required the assailed to retreat to the wall, had its origin before the general introduction of firearms. If a person is threatened with death or great bodily harm by an assailant, armed with a modern rifle, in open space, away from safety, it would be

ridiculous to require him to retreat. Indeed, to retreat would be to invite almost certain death.

[4, 5] Nor is one required to retreat when he is assailed in a place where he has a right to be, unless by so doing an affray can be clearly avoided. He may stand upon his rights, and resist tthe attack to the extent apparently necessary to avoid death or great bodily harm. Likewise one may defend his domicile or his property to the extent of taking life, when necessary in defense of his property, or to protect himself or those in his charge from death or bodily injury. Beard v. United States, 158 U. S. 550. 15 Sup. Ct. 962, 39 L. Ed. 1086; Alberty v. United States, 162 U. S. 499, 16 Sup. Ct. 864, 40 L. Ed. 1051; Rowe v. United States, 164 U. S. 546, 17 Sup. Ct. 172, 41 L. Ed. 547.

The court in the Beard Case reviews at great length the law of self-defense, and the modification of the common-law rule respecting the obligation of a person assaulted to retreat. In that case the person assaulted was on his own premises, defending his property. The court, speaking of the obligation imposed upon the defendant, said:

"There was no evidence tending to show that Beard went from his dwelling house to the orchard fence *for the purpose* of provoking a difficulty, or *with the intent* of having an affray, with the Jones brothers, or with either of them. On the contrary, from the outset of the dispute, he evinced a purpose to avoid a difficulty or an affray."

Thus the court implied that, if Beard had gone out to provoke an affray, a different rule would apply.

In the present case the defendant was neither acting in defense of his property nor attempting to avoid an affray. His going out into the areaway leaves but one inference to be drawn, namely, that he knew his presence there would cause trouble.

Nor was he in a place where, under the circumstances, he had a right to be. If conditions on the street had been normal, he would have had the right to elect that way to go home; but he had no right to go there with another way equally available, if by so doing it would invite an affray, which would almost inevitably result in the taking of life.

[6] Defendant's going from the back yard into the areaway was a voluntary act, and no principle of the law of self-defense is better established than that:

"Where a person voluntarily participates in a contest or mutual combat for purposes other than protection, he cannot justify or excuse the killing of his adversary in the course of such conflict on the ground of self-defense." 21 Cyc. 812, and numerous cases cited.

It thus appears that defendant, instead of being prejudiced, was clearly benefited by the instructions of the court on the subject of self-defense. Without it he might well have been convicted of a higher degree of crime.

[7] A number of assignments of error go to the admission or exclusion of certain evidence. It was not error to admit testimony relative to the disinterment and post mortem examination of the body of the deceased, Kenneth Crall. It was unnecessary that notice should be given the defendant of the intention on the part of the government to make the investigation. Nor is it material whether or not there was full compliance with the provisions of section 686 of the District of

Columbia Code. The evidence would· be equally admissible, whether such compliance was had or not.

[8] Likewise the testimony given by the expert witnesses, tending to establish that the bullet, extracted from the head of the deceased, was shot from the pistol found in the defendant's possession, was competent, and the examination in this particular was conducted without prejudicial error, especially when taken in connection with the testimony of defendant, wherein he admitted the firing of a number of shots at the crowd assembled in the street.

[9] Objection was interposed to the admission of testimony offered on the part of the government in respect of the pistol and certain clothing seen by the officer and found in appellant's room at the time of his arrest. It is insisted that this evidence is not admissible, since the officer had no search warrant. A search warrant was not necessary to legalize the entry of the officer into the defendant's room for the purpose of arresting him on the charge of murder in the first degree. It was likewise proper for the officer to seize, in connection with the arrest, the pistol subsequently proved to be the one used by the defendant, and to testify respecting articles of clothing seen in the room. This testimony in respect of the clothing was to identify the defendant's presence at the time the shooting occurred. Inasmuch as defendant admits that he was present and did the shooting, it is not clear how he could be prejudiced by the testimony regarding the clothing which was seen in his room at the time of his arrest.

[10] Evidence of crime obtained by officers at the time of arrest, either found upon the person accused or in his possession, do not come within the constitutional provision forbidding seizure without a search warrant. The rule is well stated in United States v. Mills (C. C.) 185 Fed. 318, 319, as follows:

"From time immemorial an officer making a lawful arrest on a criminal charge has taken into his possession the instruments of the crime and such other articles as may reasonably be of use as evidence on the trial. A blood-stained knife or garment, a half-emptied phial of poison, a mask or disguise, counterfeit coins, plates for printing counterfeit notes, gambling devices, stolen property, and many other articles are thus seized every day on the person or the premises of the alleged criminal, and no one disputes the propriety of such seizure."

[11, 12] Error is assigned in permitting certain witnesses to testify, who, it is alleged, remained in the court room in violation of the order of the court excluding witnesses from the room. The admission of testimony of the witnesses, under these circumstances, is a matter within the sound discretion of the trial court and usually will not be reviewed on appeal. In the present case, the witnesses were temporarily withdrawn from the witness stand in compliance with objections made by counsel for defendant, and merely remained in the room awaiting their recall to the stand. Counsel cannot well complain of being prejudiced by a situation which they created.

There are a number of other assignments of error relating to the admission or exclusion of testimony, all of which we have examined carefully, and find nothing which would justify the conclusion that defendant was not accorded a fair and impartial trial.

The judgment is affirmed.